Thank you, Your Honor. May it please the Court, Benjamin Schultz on behalf of the Secretary. If it's possible, I'd like to reserve three minutes for rebuttal. Everything's possible in the Ninth Circuit. Thank you, Your Honor. You have to count. Your Honor, the District Court in this case relieved L.A. Haven of the burden of establishing standing. This hospice's position throughout the litigation has been that the statute is so unmistakably clear that it allows no interpretation but the hospice's. Yet despite that unmistakable clarity, they claim, they have failed to show how that interpretation would actually stand to benefit them in the fiscal year at issue. Because they have failed to make that calculation, a calculation, by the way, that a number of other hospices have made in other litigation, this hospice lacks its standing. Now, Your Honor, that addresses the practical concern that the District Court had. But it's also the case that the District Court's standing analysis was legally wrong because what the District Court did is simply conclude that an assertive failure to follow the law is an injury, in fact, sufficient to confer standing. The Supreme Court has rejected that proposition in a long line of cases, such as Allen v. Wright and Steele Co. v. Citizens for a Better Environment, and yet the District Court persisted in that interpretation. If the statute is plain and the application, the regulation, is in conflict with it, why isn't this a facial attack? Well, Your Honor, we would agree that the plaintiff's complaint could be read to bring a facial attack. The problem is that as a jurisdictional necessity, it can't have brought a facial attack, and that's because of the interaction of several sets of statutes. First of all, because of the interaction of 42 U.S.C. section 1395ii and 42 U.S.C. 405h, federal question jurisdiction had been completely precluded in Medicare reimbursement cases. So as a jurisdictional necessity, the only jurisdiction that the federal court had was the jurisdiction conferred by section 139500f. That statute makes clear that the only thing that you can get jurisdiction to challenge in a district court is jurisdiction over a particular fiscal year's overpayment determination. And here, because we're under the expedited judicial review grant, it's the action of the fiscal intermediary that was challenged before the Provider Reimbursement Review Board. Now, Your Honor, because this is only a challenge to a particular fiscal year's overpayment determination, their failure to establish standing as to that fiscal year should resolve the case. And I'd be happy to talk about standing further if the Court has questions about it. But I'd also like to address the merits, because here what the district court did is it failed to recognize the ambiguity in the statute. And that ambiguity comes from the word reflect. The district court apparently thought that the word reflect means mathematical, complete mathematical accuracy. But that's not the case, Your Honor. And in fact, in understanding the word reflect, it's important to recognize that we're not only looking at the statutory text in a vacuum, but also looking at the general administrative scheme. Here, there are a number of practical considerations that counsel HHS's interpretation and at least show why the statute is ambiguous such that the district court was wrong to strike down the regulation under Chevron Step 1. In particular, Your Honor, there's the important practical consideration that when the hospices submit information to the fiscal intermediary and the intermediary does this calculation, if the intermediary were going to use exact mathematical proportionality as the plaintiffs urged, the intermediary would need to know the date on which every beneficiary died or completed hospice care, because otherwise you would never know the denominator to use in the calculation. I agree that that may be a practical problem for the Secretary. It's not clear why that practical problem should inform our judgment about the word reflect. If I turn to the deputy and say, you know, let the record reflect that I asked counsel a question at 16 minutes into his 20-minute argument, I don't really want an approximation of that. I don't want him using some kind of statistical method for writing these things down. I want him to write it down. Well, Your Honor, that is one interpretation of the meaning reflect. But I could submit a draft brief to a client. They come back with clients. They could come back with a number of comments, maybe 20 comments. And then I send them a recirculated draft that incorporates 10 comments, and I say, this reflects your input. Now, it doesn't reflect all of the input that they provided, but it reflects some of the input that they provided. Well, if I gave a clerk instructions and then said, here are the edits to your draft opinion for me, and here's what I like and what I didn't like, and here are the line edits, and then when they bring them back and said, this reflects your changes, and I find out they haven't made all of the changes, I'm going to be pretty irritated. Well, Your Honor, I am. You're supposed to write them on blank paper to start with and not let your clerks write your opinions. Well, Your Honor, all I think that this colloquy shows is that the word reflect can have different meanings, and perhaps in some contexts it might mean exact mathematical accuracy. Well, let's take it. I mean, you're isolating on the word reflect, but it says such number reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year. Now, in that context, reflect could be something in the water, and it's not a perfect reflection because the wind is rippling the surface of the lake. Okay, I'll grant that it may make some allowances in some contexts for fuzziness or ambiguity. But in that context, such number reduced to reflect the proportion, it's pretty straightforward, isn't it? It's more like what Judge Bybee was talking about. Well, respectfully, Your Honor, we would disagree with that, and actually this gets back to the full answer that I would like to give to Judge Bybee's question, which is that what this Court has made clear and what the Supreme Court has made clear is that in deciding whether or not a statute is ambiguous at Chevron Step 1, you use all of the traditional tools of statutory construction. And so here, without question, one tool would be to look at the plain language of the statute, but that's not the only tool. And here we submit that the practical considerations at stake here also come into play and help inform how the statute was meant to work in this administrative scheme. Furthermore, Your Honor, the legislative history, we think, bears that out. All that Congress seemed to be concerned about when it enacted this statute was preventing double-counting beneficiaries. Now, their method — If Congress wanted a precise day-by-day calculation, if they wanted an exact proportion around the ending and the beginning of each fiscal year, what language should Congress have used here? Well, Your Honor, they could have specified the calculation in a mathematical matter, or they could have said such number reduced so that it is the exact proportion. But they didn't say is. They said reflect. And we submit that that's why there was a degree of ambiguity and some degree of discretion afforded to the Secretary. Even if you're right about the estimating of the proportion, the problem is that the Secretary hasn't done that. The Secretary wants to throw it all into one year. It's not reflecting a proportion at all. Some years get zero and some years get 100 percent. Well, respectfully, Your Honor, I think you're actually operating under a misconception that the district court here and some of the other district courts have operated under. And that's that the number that has to be reduced under the statute is not the number one, which is representing one beneficiary, but the number of aggregate beneficiaries in the hospice. And as long as that aggregate number is reduced in a manner that reflects the rest of the statutory phrase, then that aggregate number complies with the statute. Here what the Secretary has done is it said, all right, we're going to look at individual patients, and we're going to assign each individual patient to an accounting year by predicting when that patient spends the greatest proportion of their time. The result of that, because individual inaccuracies will balance out, is that the over-aggregate number is reduced to reflect the proportion. Now, Your Honor. Well, respectfully, Your Honor, I think, again, that misunderstands, one, the nature of the district court's jurisdiction, and, two, the operation of the statutory cap. Now, because this case is only about one particular fiscal year, the only thing that is at issue in this case is the number of beneficiaries. So for fiscal year 2006, you have a cap amount,  and that is the number of beneficiaries. That cap amount has to be multiplied by the number of beneficiaries in the hospice in that year. So the only way that the hospice would be better off under its view of the statute is if it can increase its number of beneficiaries in 2006. Now, I think what Your Honor may be getting at with that question is their argument about how their length of stay is longer than the 70-day length of stay that the hospice assumed. The problem with that, Your Honor, is that that argument is mathematically irrelevant to the 2006 fiscal year calculation. Now, we would agree that when a hospice has an above-average length of stay, you could create an argument that shifting to exact mathematical proportionality might shift some beneficiaries, some partial beneficiaries, from 2005 to 2006. But that exact logic equally explains why you would be shifting or be likely to shift some beneficiaries from 2006 to 2007. So to know whether or not the number of beneficiaries would increase under their calculation in fiscal year 2006, it's not enough to know the average length of stay. You have to know how the relative size of those two shifts compare. If more people get shifted into 2006 than get shifted out of 2006, then the hospice is better off under its calculation. If the reverse is true, then the hospice is worse off. And, in fact, Your Honor, I think that just further feeds into our standing argument that when you understand how this kind of calculation works, at the end of the day it could be that they owe the government more money. And if you accept the district court's view of standing and its view of Article 3, then you would have to accept the proposition that a plaintiff suffers redressable injury in fact when it complains about the fact that the government is giving it too much money. I think the Supreme Court said it quite well in Steele Co. when the opinion for the court talked about however much an individual might get psychic satisfaction from the fact that the United States Treasury has not cheated or that a wrongdoer gets its just desserts, that is insufficient to confer Article 3 standing. It's not an injury in fact. Now, unless there are further questions about standing or the merits of the regulation, I'd also like to turn to the nationwide injunction that the district court issued here. Because here that nationwide injunction is wrong as a matter of general APA law and it's especially wrong. I think you ought to reserve your time and see how much they push on that. Certainly, Your Honor. And if that's the case, then unless there are further questions, the court would like to address now on that. That one I think is easier for us to grapple with and the intricacies are shifting fiscal years in proportion, so. Certainly, Your Honor. That's what they have to say and I want to make sure you have time to respond. Then in that case, I'd reserve the balance of my time. Thank you. Thank you. Thank you, Your Honors. May it please the Court. Brian Dauscher for Los Angeles Haven Hospice. This case presents one of many, many cases now pending throughout this country on the question of the validity of a single federal regulation. And in this case, the district court, in our opinion, came to the correct answer, both on standing, on the validity of the regulation, and as to the proper remedy in this case. In the opening argument, the government suggests that we need to show the, quote, benefit that the hospice would receive from a ruling that the regulation is invalid. And actually, I'd suggest that really we should return to breaking down the standing into injury, causation, and redressability. Those are really the touchstones. The injury here is clear. $2.3 million demanded back from my client. Causation, that demand is issued entirely based upon a calculation, non-severable in any part, on 418.309B1, the regulation. Redressability, I would submit that there's a lot of redress that my client has already received, set aside of the regulation, injunction against use of the regulation as to the hospice going forward, in order for return or credit of the funds unlawfully collected. That's a lot of redress. That is not a psychic pleasure. That is a lot of redress. Judge Wu's order actually required the government to credit or return that money within a year, and last month the government returned a check for $800,000 of unlawfully collected funds to my client. And so I'm puzzled as to which element of standing has not been met in this case. What if in the next fiscal year, 2007, the calculus caused your client to have to reimburse the government because of the way that, under your interpretation, the proportionality would shift the number of beneficiaries? As I understand the argument, it's not a beneficiary, it's the aggregate amount, so that it is, again, I may be not fully understanding the argument, but the thrust seems to be it could go up or down depending on factors, and therefore the fact that you may have gotten relief in 2006, although in that case you had to pay, right? We had been subject to collection efforts and repayment demands. Okay, so you had to pay. So maybe the hypothetical would be in the next year it shifted the other direction against the government. You're saying the only reason you got redressability is on the assumption that your interpretation is correct. What I'm saying is that when we look at redressability, first of all, the courts have regularly noted that that is a relatively relaxed standard to show because we know that we're talking about future events in that context. And what the government wants to do by demanding some proof from the hospice, from the plaintiff, that they will be better off overall is to shift its own burden to defend its regulation through a harmless error analysis under the APA if it chooses to do so. And it never, not in any case in this country, has offered any evidence to show that this error is harmless. I suppose how would they show that, go back to the past as opposed to projecting to the future and apply retroactively to the calculus and show that if your interpretation held up, then you could go back and readjust the prior, you know, FY200005-20024 and show that, show those variables? I mean, I suppose that if they wanted to undertake that proof, the way they would do it is to look at the overall picture across all years and say that the hospice isn't going to be any better off. But they've never undertaken that, and for good reason. Judge Hall noted this, that if you move a unit from year one into year two, right there the hospice gets a benefit because units are worth more in later years. So, you know, right off the bat you have a problem when you presume that you can simply move units from one year to a subsequent year without actually net conferring any benefit. But the benefits to us are far greater, but, you know, I feel like we have more than met a burden of mere standing in this case, and what the government's trying to do is to use that and conflate standing with the merits here. In fact, a merits defense, it's often the case that defendants will try to import into standing the burden to prove the damages in a case, and courts reject that. Here we have actually a further error, I think, where they not only attempt to advance that showing to standing, but they attempt to shift it from where it rightfully belongs, which is on the government's shoulders, to prove harmless error if they think it's harmless, which they don't, onto the hospice to show harmful error just to get into court. And that's just not consistent with any case, and in the Lujan v. Defenders case, Justice Thomas was clear that where someone is the direct object of action under a regulation, then there's little question of standing, and that is the case here. You have a concrete, specific regulation pursuant to which my client is subject to multiple millions of dollars of repayment demands, and the last nine courts that have looked at it have all agreed there's standing. I think that's more and more receding. In terms of the regulation, I would submit that what you hear from the government is nothing more than a post hoc rationalization for the regulation. When HHS published this regulation, there was no masking of their intent. We've cited two pieces of the Federal Register where HHS expressly admitted that although the act requires this proportional allocation, such an adjustment would be difficult. We believe the proposed alternative of counting the beneficiary in the reporting period where the beneficiary is expected to use most days would be less burdensome. We are, and they say rather than attempt to perform a proportional allocation, we're going to allocate the entire allowance to the initial year of service. There was no rationalization about aggregate and reflect back in the day when HHS published this regulation. There was only an admission, a declared intent to violate the express instruction of Congress in terms of how to calculate the cap. I don't think there's a lot of debate around the country now about the validity of the regulation. We've offered repeatedly throughout the briefing cycle updates to the court on decisions that have come out, and not a single court in this country has ever uttered a word in defense of this regulation. And now courts are simply citing to overwhelming authority of invalidity, long line of cases for the invalidity. And part of that stems from the district court in this case's forceful early opinion where it said this is just clearly in conflict with the statute. And when the government says that the word reflect is licensed in this case to allocate everybody to one single year, what they really mean is that that's licensed to distort the calculation. And it was firmly rejected, and no court has chosen to criticize it. If that's the case, counsel, then what was the need for a nationwide injunction if this is being simultaneously considered among other courts? Hasn't the district court sort of made itself first among equals? Well, I would submit that at some point some court has to tell the agency to stop. And the problem we have in this case is that the agency will not stop. HHS has a long history of non-acquiescence in decisions by certain courts of appeals. But it usually works itself out. And when you've got litigation going on simultaneously in the Fifth, Tenth, I don't remember what other circuits, you had that. Why should we be dictating to everybody else what's going to happen with the statute? Well, the D.C. Circuit in National Mining explained why. It's just a natural consequence of what Congress asked the courts to do in the APA. Congress said hold unlawful and set aside the action that's disputed. And in National Mining, the D.C. Circuit reviewed the reasons why. In the case of a facially invalid regulation, and that is a limited subset of cases, in the case of a facially invalid regulation, where the particular circumstances of the plaintiff aren't relevant, but what is relevant is merely a comparison of statutory language to a regulation, the court should enter a nationwide injunction to reduce repetitive litigation. Is there any reason that your client needs a nationwide injunction? No. It's true that the injunction asked to my client is sufficient to give it relief. But I would submit that the APA, what I would submit is that it is not mandatory for the district court to enter a nationwide injunction, of course. I would also say that it's within the court's discretion to do so, though, under the APA, because the APA authorizes the court to hold unlawful and set aside. The government in this case, as you're well aware, would deny the courts even the discretion to enter a nationwide injunction. And then the question must become how and when does the government stop using a simply, facially invalid regulation? How many district courts does it take? How many courts of appeal does it take? Well, once they have three or four or five circuit courts and they've all agreed, it seems to me that the technology has converged, so to speak, and HHS is going to get the message. If they can convince somebody that it's not a problem, then you've got a conflict in the circuits and the Supreme Court will simply resolve it. And that may be a healthy process to see whether the Fifth Circuit sees something in this statute that we haven't. And I think when the district court in this case entered the nationwide injunction, it recognized that decisions would follow. And so it granted a stay of that nationwide injunction pending this appeal. And so now this court has the benefit of an additional 10 or 12 decisions out of district courts. Isn't it true that there's the ones on appeal in the D.C. Circuit, ones on appeal in the Tenth Circuit, and ones on appeal to the Fifth Circuit? Yes, there are appeals pending. And there are no circuit decisions. We would be the first circuit to uphold a district court in this case and then approve a national injunction. That's true. If you look at the history of the national mining case, there was not another district court even that had held that fallback dredging regulation invalid. How long is this in this case? How long is this interpretation? How long has HHS's interpretation been applied in practice? The regulation was put in place in approximately 1983. So it's taken this long for this issue to be litigated up, and this practice has been in effect all that time. Congress has never acted on it. Well, the Supreme Court has spoken about the lack of congressional action and the time that might pass in Brown v. Gardner. And the Supreme Court had clear instruction for the lower courts. One, it said that the age of a regulation is no antidote to a clear inconsistency. And secondly, it said quiescence by Congress cannot be invoked to baptize a statutory gloss that is otherwise impermissible and noted that it may be taken as a national injunction. Is that in the context of a national injunction? It is not. In fact, the Supreme Court has not ever ruled expressly on a nationwide injunction for facial invalidity. But in Lujan v. National Wildlife, Justice Blackmun, in a dissent, but which is recognized by the D.C. Circuit as expressing the opinion of the court, expressly stated that a single plaintiff can achieve programmatic relief in this context. And it was that language that the D.C. Circuit and national mining used to say, of course, we are not going to have repetitive litigation throughout the country about the validity of a single regulation. As this Court is aware, we now have a relatively significant body of regulations issued by the Department of Health and Human Services. And I would submit that the APA is designed, an expedited judicial review is designed, to consonant with Federal Rule 1, just, speedy, and inexpensive resolution of cases. Well, I understand that. But, you know, in fact, I was just on a panel that came down in an environmental case where we overturned EPA's 35-year rule, civil cultural rule. It didn't stop us from making that decision, but it didn't involve us dictating the outcome for all future cases. And it doesn't stop another circuit from disagreeing with the analysis on the validity of the regulation. Another circuit can certainly overturn a district court's decision about the validity. Then overturn a national injunction. No. I mean, I think at that point there is going to be a conflict. There's no doubt. But I'd submit that the D.C. Circuit addressed that in the context of the national mining case and said it's just a natural result of what Congress intended with respect to regulations. And what you have here is an agency that is resisting judicial review by fighting on standing grounds, by post hoc rationalization of regulations. And if the courts don't send the signal that there is going to be effective judicial review and a cessation to unlawful conduct. Well, they haven't litigated it yet to the circuit courts. You've cited a lot of circuit courts, and now you've said that they were following in the footsteps of an earlier opinion by Judge Wu in the central district. There may be a body of district court law, but it does seem that it's a little peremptory to say that, well, they get one now to a circuit court and none of those district courts entered national injunctions, did they? No, but I think that that can be found in the district courts learning to get along with each other. They saw on the record already. Well, I don't know what they decided. I mean, I don't know about getting along or maybe just going along because they decided they were persuaded by Judge Wu and let the Ninth Circuit take the hit if either are. Well, I would submit that they knew about Judge Wu's nationwide injunction and they felt that they did not need to go there because Judge Wu had gone there. I don't think that you can read into the opinions of the other judges a disagreement with that or any offense taken at that. I think other district courts in this country who have not yet been the recipients of these filings will be grateful. Excuse me. Are all the district court opinions that have been entered all followed Judge Wu's, that is, and been subsequent to? In terms of the validity of the regulation, yes. There's not a single court that has suggested the reg is valid. No, no, no. I'm saying in terms of chronology. Nobody preceded him in finding this regulation invalid. There was a court in Oklahoma that preceded him in finding the reg invalid. That was Sojourn Care. And in that case, though, the court fell short of entering a judgment and stumbled on the standing question, frankly. And so there's a confused set of remand orders in that case. But I would submit that the D.C. Circuit and National Mine has made it clear that a nationwide injunction is a proper remedy in an APA, facial validity case. There's a lot of cases where constitutional questions are presented or the factual circumstances of a particular plaintiff are at issue. Minehold, other cases like that, Virginia Society. I don't think that when you have a simple facial validity challenge that it's an abuse of discretion for a court to bring that to an end by a nationwide injunction. And Judge Wu, I would submit. You're going to run it. Can I get you? I don't want to overload this issue, but I'd like to just find out another aspect of it. If this were restricted to your client, would the injunction apply not only to fiscal year 2006, but would it apply to subsequent fiscal years? It does, and that is the language of the injunction, and that has not been challenged by the government in its briefs, that scope of the injunction. So it's only whether it goes beyond your client. As far as on a going-forward basis, your client with a limited injunction would be protected on a going-forward basis. Yes, but there is an irregularity in the law that develops from creating a protected class of hospices that for any number of years are insulated from calculation. What the government, when it has a regulation on the books, the administrative law is that the agency is required to follow that regulation. And so you have one set of providers who are insulated from action under that regulation and another set of providers who are subject to action under that regulation. And so it begs the question, how is Los Angeles Haven Hospice going to be treated in future? I can foresee, because of circumstances in other cases that are arising right now, that the government may take the position that it can adjudicate, quote, unquote, Haven Hospice's cap liability in a sub-regulatory. If we agree with Judge Wu on the merits, then HHS would do so at its peril with respect to any other hospital within the circuit. Yes, I think that... As a practical matter, we have, you know, a fifth of the country covered by virtue of your client. And they will be grateful for that. I assure you of that. They will be grateful for that. But it does raise some questions about the perception of government by the people when part of the country is protected from cap calculations and part are not. I can tell you that I can't explain that to my clients, why that is so. You don't have to go around the country. You can confine yourself to the nine western states and the territories. I am glad that I live here. Let me see if Judge Wu's opinion has been so impressive that perhaps the other circuits or other district courts will decide to... Eventually. The sad truth is that, meanwhile, many hospices will go out of business because they don't have the financial wherewithal to come to court and force this process.  We appreciate the court's attention to these matters. But it's not cheap and it's not necessarily very quick. Okay. Thank you, Your Honor. Thank you. Counsel, do you want to defend HHS's policy of non-acquiescence? I would, Your Honor. But actually, before we get to that, if I can just correct something important that I think opposing counsel said that we vehemently disagree with, and that's what's at issue in this case. They've suggested that we're not challenging all of the hospice-specific relief, and that is wrong. We have said, as a jurisdictional matter, that the only thing that the district court had jurisdiction to do was set aside the particular year's overpayment decision, and that follows from this court's holding in Pacific Coast. And, indeed, four other circuits have made similar holdings as this court in Pacific Coast. So you're saying that under Judge Wu's order that HHS, for fiscal year 2007, 8, 9, 10, can go back to its original rule? Well, Your Honor, here I think we get to what Your Honor was exploring in the colloquy with Mr. Downs earlier, that in the sense of would we risk contempt if we did that? No, we wouldn't risk contempt if we did that. But as a practical matter, it's hard to imagine that the agency would continue to apply its regulation within the Ninth Circuit if this court were to hold that the regulation is invalid. I mean, for one thing, it would be foolish as a litigation statute. For another thing, I suspect we would get hit with a lot of applications for EJIA fees because it would be hard to show that our position was substantially justified within this circuit in the face of a definitive circuit announcement. But you wasn't understanding, then, what you were disagreeing with? Well, we're disagreeing with the injunction as to any year, whether we're disagreeing with any relief that the district court ordered, other than its determination that the 2006 calculation wasn't valid. In our view, the proper ---- That's all more than that. It's invalid based on your interpretation of the regulation. Exactly. And the relief that flows from that is a remand to the formal administrative proceedings from whence this ---- This is all a consequence of your standing argument. If we disagree with you on standing and that this is a facial challenge, then the scope of the injunction as applied to the plaintiffs here is acceptable. No, Your Honor. This is a fact. This is a statutory jurisdiction argument. And this comes from the interplay of the elimination of federal question jurisdiction and the fact that if jurisdiction exists at this case at all, it exists only by virtue of 1395.00F1. Indeed, this Court has recognized that numerous occasions. Most recently, I think there was a case in 2007 this Court decided. Okay. I think I've got the gist of where you're going with that. All right. So it's only because the PRRB has denied relief here and that they've taken it up from there, so that's an FY2006 problem only. Exactly. It's a statutory jurisdiction matter. But it's a practical matter. You're not going to go back and in the next fiscal year charge them based on this regulation if we agree with Judge Wu. Your Honor, if this Court finds standing, and I think that's still really in question as to 2006, the only year that's in question here. Assume that we're going to affirm Judge Wu's order with the exception of the nationwide injunction. Right. As a practical matter, it seems hard for me to believe that the agency would persist in using this regulation within the Ninth Circuit based from a definitive decision from this Court. But that does not mean that the District Court had the jurisdiction to issue the injunction, and that's exactly what this Court held in Pacific Coast after it considered and rejected the kind of practical arguments that opposing counsel had made about efficiency. As this Court explained in Pacific Coast and as the Supreme Court explained in Illinois Counsel v. Shalala, Congress in its judgment decided that the best way to have these proceed was to go through the administrative channeling process. Now, Your Honor, I do want to go back to standing because I think some of the Court's questions may have reflected a misconception of what this case is about. Because as a statutory jurisdiction matter, it can only be a case about 2006. It's incumbent upon them to show as a matter of Article III standing for, you know, we're not invoking the APA prejudice rule. It's a matter of Article III standing why there's injury. And, you know, I think Mr. Dauter said the last nine District Courts have found standing. What he's not telling you is that in many of those cases, the hospices have done the recalculation that we've told them that they need to do. And, indeed, I want to especially point out the Hospice of New Mexico case, which is now pending in the Tenth Circuit. That's a case where the hospice submitted a declaration that it said it has 193 average day length of stay, well in excess of the 70 days here. But it submitted its calculation for two fiscal years. And just as we would have expected, in one of the fiscal years, it turned out that it actually does better under HHS's method than under its view of the statute. Whereas in the other fiscal year, it turned out, yes, it does, it suggests that it does better under its view of the statute. Now, we're not challenging the hospice's standing as to the year where it established injury. But we certainly are challenging the hospice's, excuse me, the hospice's standing as to that fiscal year where its own calculation suggests that it's likely to owe more money to the government. Here, Your Honor, you have a hospice that has steadfastly refused to introduce that simple calculation as to fiscal year 2006. All that we're asking the hospice to do is say, look, in any year where this injures you, come to court after exhausting your administrative remedies, show us using these calculations that other hospices have done that, in fact, this regulation is causing you injury in the fiscal year for which the court has jurisdiction, and then you have standing and we can litigate the merits. It's been Mr. Gausher to say that they had, that HHS owed them $2.3 million and that they were given a check for $800,000. Well, Your Honor, that is Well, first of all, we don't, first of all, Your Honor, we don't agree that the district court had jurisdiction to award that relief because that goes beyond setting aside the action of the fiscal intermediary that was challenged in this case. But in any event, it's only interim relief because at the end of the day, the case still has to get remanded to the formal administrative proceedings from whence it came. And in those formal administrative proceedings, HHS will do the recalculation under the method that the plaintiff suggests is, in fact, required. And at the end of the day, it's almost certainly going to be the case, not only that they're going to have to give back every cent that they've all, that we had to give back to them, but in fact, that they're going to owe much, much more. I mean, in fact, if you look at the hospice's length of stay here, 249 days, I think they said their average length of stay. That's a startling number and well outside the mainstream. And it's a mathematical certainty if you look at the, you know, the costs that they get reimbursed on a per diem case. It turns out to be a mathematical certainty that they're going to owe something to HHS back under a recalculation. And it seems extraordinarily likely that they're going to owe almost all of the $2.3 million, if not more than the $2.3 million. So the fact that as an interim matter they've gotten $800,000 back during the pendency of this appeal certainly doesn't show that at the end of the day, when the district court's final judgment is modified by this court, if necessary, is entered, that they're actually better off. And furthermore, Your Honor, I think that the fact that they got interim relief is just a bootstrapping argument where it says that if we wrongly convince the district court that we have standing to litigate the fiscal year at issue, then the district court can issue an interim remedy. And because we got that interim remedy, therefore, we had standing all along. That makes no sense. If the district court didn't have jurisdiction at the outset of this lawsuit, and the Supreme Court has been clear that jurisdiction is determined at the outset of this lawsuit, if Article III standing didn't exist at that time, then the fact that they got some interim relief to which they weren't entitled doesn't mean that the court had Article III jurisdiction. I'd be happy to address any other further issues on standing if the court has questions. But if I could turn just very briefly to the nationwide injunction, I think this court has properly reflected its concerns as a practical matter. But I just want to add that National Mining Association in the D.C. Circuit was not a case within this administrative scheme. And the D.C. Circuit never suggested that this was the appropriate kind of relief in a case governed by 1395OOF1. And in any event, Your Honor, it's not clear that the D.C. Circuit's decision in National Mining has even survived the Supreme Court's more recent decision in Monsanto for which we submitted a 28-J letter. If there are no further questions, then we would rest on our knees. No questions. Thank you. Counsel, well-argued on both sides, and we appreciate the argument. It's very helpful.
judges: Hall, Fisher, Bybee